UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ALLEN R. WASHINGTON, | Case No.17-cv-07373-VKD |
| Plaintiff, | |
| v. | **ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| NANCY BERRYHILL, | Re: Dkt. Nos. 25, 30 |
| Defendant. | |

Plaintiff Allen R. Washington appeals a final decision by defendant Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act") and for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq*. The parties have filed cross-motions for summary judgment. Dkt. Nos. 25, 30. Pursuant to the Court's order (Dkt. No. 18), each side also submitted statements of the administrative record. Dkt. Nos. 25-1, 30-1, 31-1. The matter was submitted without oral argument. Upon consideration of the moving and responding papers, the relevant evidence of record, and for the reasons set forth below, Mr. Washington's motion for summary judgment is granted in part and denied in part, the Commissioner's cross-motion for summary judgment is granted in part and denied in part, and this matter is remanded for further proceedings consistent with this order.[1]

---

[1] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 9, 15.

# I. STANDARD FOR DETERMINING DISABILITY

## A. The Five-Step Analysis

A claimant is considered disabled under the Act if he meets two requirements.[2] First, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Second, the impairment must be so severe that a claimant is unable to do previous work, and cannot "engage in any other kind of substantial gainful work which exists in the national economy," considering the claimant's age, education, and work experience. *Id.* § 423(d)(2)(A).

In determining whether a claimant has a disability within the meaning of the Act, an Administrative Law Judge ("ALJ") follows a five-step sequential analysis:

At step one, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If so, the claimant is not disabled. If not, the analysis proceeds to step two.

At step two, the ALJ assesses the medical severity of the claimant's impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* §§ 404.1520(c), 416.920(c). If the claimant has a severe medically determinable physical or mental impairment, or a combination of impairments, that is expected to last at least 12 continuous months, he is disabled. *Id.* §§ 404.1509, 404.1520(a)(4)(ii), 416.920(a)(4)(ii), (d). Otherwise, the evaluation proceeds to step three.

At step three, the ALJ determines whether the claimant's impairments or combination of impairments meets or medically equals the requirements of the Commissioner's Listing of Impairments. *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If so, a conclusive presumption of disability applies. If not, the analysis proceeds to step four.

---

[2] The standards for determining disability are the same under both the SSI and DIB programs. *Nelson v. Comm'er*, No. C 07-1810 PVT, 2010 WL 4973623, at *1 n.2 (citing *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994)).

At step four, the ALJ determines whether the claimant has the residual functional capacity ("RFC") to perform his past work despite his limitations. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant can still perform past work, then he is not disabled. If the claimant cannot perform his past work, then the evaluation proceeds to step five.

At the fifth and final step, the ALJ must determine whether the claimant can make an adjustment to other work, considering the claimant's RFC, age, education, and work experience. *Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If so, the claimant is not disabled.

The claimant bears the burden of proof at steps one through four. The Commissioner has the burden at step five. *Bustamante v. Massanari*, 262 F.3d 949, 953–54 (9th Cir. 2001).

## B.       Supplemental Regulations for Determining Mental Disability

Where there is evidence of a mental impairment that allegedly prevents a claimant from working, the Social Security Administration ("SSA") has supplemented the five-step sequential evaluation process with additional regulations to assist the ALJ in determining the severity of the mental impairment, establishing a "special technique at each level in the administrative review process." 20 C.F.R. §§ 416.920a(a), 1520a(a) (2016). First, the ALJ evaluates the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment." *Id.* §§ 416.920a(b)(1), 1520a(b)(1) (2016). For each of the categories contained in the adult mental disorder listing, these specific symptoms, signs, and laboratory findings are described in "paragraph A." 20 C.F.R. pt. 404, Subpt. P., App. 1, § 12.00 (2016).

If the claimant has a "medically determinable mental impairment," the ALJ assesses the degree of the claimant's functional limitation in the four "broad functional areas" identified in paragraph B and paragraph C of the adult mental disorders listings. *See* 20 C.F.R. §§ 416.920a(c)(3), 1520a(c)(3) (2016); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *4 (July 2, 1996).[3] At the time of the ALJ's decision, those four functional areas were: "Activities

---

[3] "SSRs do not have the force of law. However, because they represent the Commissioner's interpretation of the agency's regulations, we give them some deference. We will not defer to SSRs if they are inconsistent with the statute or regulations." *Holohan v. Massanari*, 246 F.3d 1195, 1202 n.1 (9th Cir. 2001) (citations omitted).

of daily living; social functioning; concentration, persistence, or pace; and episodes of decomposition." 20 C.F.R. §§ 416.920a(c)(3), 1520a(c)(3) (2016). Limitations are rated on a "five-point scale: None, mild, moderate, marked, and extreme." *Id.* §§ 416.920a(c)(4), 1520a(c)(4) (2016). When discussing the fourth functional area (episodes of decompensation), the limitation is rated on a "four-point scale: None, one or two, three, four or more." *Id.* §§ 416.920a(c)(4), 1520a(c)(4) (2016). Based on these limitations, the ALJ determines whether the claimant has a severe mental impairment and whether it meets or equals a listed impairment. *See id.* §§ 416.920(d)(1)-(2), 1520a(d)(1)-(3) (2016). This evaluation process is to be used at the second and third steps of the sequential evaluation discussed above. SSR 96-8p, 1996 WL 374184, at *4 ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process.").

If the ALJ determines that the claimant has a severe mental impairment that neither meets nor equals any listing, the ALJ must assess the claimant's residual functional capacity. 20 C.F.R. §§ 416.920(d)(3), 1520a(d)(3) (2016). This is a "mental RFC assessment [that is] used at steps 4 and 5 of the sequential process [and] requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments . . . ." SSR 96-8p, 1996 WL 374184, at *4.

## II.     BACKGROUND

Mr. Washington was born in 1957 and was 59 years old at the time the ALJ rendered the decision under consideration here. AR 188. As a child, he suffered abuse from family members. AR 700–01. He identifies as transgender. *See, e.g.*, AR 701, 807, 840 ("Veteran does not go by any other name than Allen. Veteran tells me that he does not care whether he is referred to in male or female pronouns at this time.").

Mr. Washington has a high school education and previously worked as a loan application clerk, consumer finance manager, stock clerk, sales person, and accounts payable clerk. AR 61–64, 209, 259–64. He served in the U.S. Army from 1975 to 1978 and consequently receives

healthcare and housing assistance through the Veterans Affairs ("VA") healthcare system.  AR 472.  Mr. Washington also receives general assistance and food stamps.  *Id.*

On September 18, 2014, Mr. Washington applied for SSI and DIB based on his history of pulmonary embolism and depression, alleging onset of disability on November 15, 2013.  AR 188–95.

A.      **Summary of Relevant Medical Evidence**

The record includes medical evidence from Mr. Washington's treating physicians, nonexamining physicians, social workers, clinical psychologists, and other medical care providers, as well as two function reports that Mr. Washington completed.  The medical evidence spans the period of time from February 5, 2013 to January 25, 2016.

1.      **Kaiser Permanente hospitalization**

In late November and early December 2013, Mr. Washington experienced progressive dyspnea (shortness of breath) on exertion over a two- to four-day period, which worsened when he was required to climb ladders at the warehouse where he worked.  AR 746.  He was hospitalized at the nearest emergency room at Kaiser Permanente from December 1 to December 3, 2013 for treatment of bilateral pulmonary embolism.  *Id.*; AR 336–82, 409–10.  He was released on enoxaparin and coumarin (warfarin) therapy.  AR 746.

2.      **VA anticoagulation clinic treatment**

Mr. Washington received treatment from the VA's anticoagulation clinic beginning on December 9, 2013.  AR 739–43; *see also* AR 460–64.  Between December 6, 2013 and May 14, 2014, Mr. Washington's INR levels[4] were tested 13 times.  AR 709.  His results were within the target range of 2.0 to 3.0 the majority of the time, except for: the week following his hospitalization; on January 2, 2014, when his INR level was above the target range for an unknown reason; on January 13, 2014, when his INR level was below the target range due to lower dosage and a missed dose; and on May 14, 2014, when he accidentally took a higher dose than instructed.  *Id.*; AR 729, 731.

---

[4] The Court is informed that the International Normalized Ratio (INR) is an expression of test results for prothrombin time (i.e., how quickly a patient's blood clots) for patients taking warfarin.

### 3. Treating physician Sally Masters, M.D.

Dr. Masters was Mr. Washington's primary care physician at the VA who began treating him in January 27, 2012. AR 33, 751.

#### a. December 6, 2013 visit

Mr. Washington saw Dr. Masters for a follow-up appointment after he was released from the hospital. AR 746–47. She noted that his breathing was improving but had not yet returned to normal. AR 746. Dr. Masters also noted that Kaiser had found no clear etiology for the pulmonary embolism. *Id.*

#### b. February 7, 2014 visit

Dr. Masters met with Mr. Washington on February 7, 2014. AR 718–21. She noted that he had no prior history of depression. AR 718. He told Dr. Masters that his mood had been down and that he experienced low energy, anhedonia, and decreased motivation. *Id.* She described him in her notes as a "pleasant [patient] who appears mildly depressed." AR 719; *see also* AR 720 (noting "[m]ild depression"). She prescribed him citalopram (Celexa). AR 720. Mr. Washington declined a mental health and behavioral health referral. *Id.* Mr. Washington told Dr. Masters that he had thought about taking his life prior to joining the military in 1975, although he denied any current suicidal thoughts. AR 718, 721.

With respect to his pulmonary embolism condition, Dr. Masters noted that Mr. Washington continued to take warfarin, and that although he denied chest pain or shortness of breath, he had not been very active and therefore did not know whether he became short of breath with activity. AR 718. Dr. Masters recommended an additional three months of anticoagulation treatment for a total of six months and noted that he could cease treatment at the end of May 2014. AR 720. Mr. Washington stated that he did not yet feel that he was able to return to work full-time. AR 718. Dr. Masters advised Mr. Washington that he could return to work when he felt he was physically able to perform his tasks. AR 720. Mr. Washington also informed Dr. Masters that he had been obtaining female hormones "online" and using them for the past three years to address his gender dysmorphia and sought to continue hormone therapy through the VA, but Dr. Masters informed him that hormone therapy was an absolute contraindication given his history of pulmonary

embolism.  AR 500–01, 720.

### c.  September 11, 2014 visit

Mr. Washington saw Dr. Masters on September 11, 2014.  AR 640–42.  He complained of "'extreme exhaustion' and mild substernal chest pain/pressure which is intermittent."  AR 640.  He described his current symptoms as much less severe than when he was hospitalized in December 2013.  *Id.*  Mr. Washington stated that he had been relatively sedentary at home due to shortness of breath on exertion.  *Id.*  Dr. Masters noted that his oxygen saturation was 99-100% with ambulation in the clinic.  AR 641, 642.  She ordered, among other things, a chest x-ray and a lung scan.  AR 642.  She attributed the pulmonary embolism to Mr. Washington's use of estrogen.  AR 640.

Dr. Masters also noted that Mr. Washington complained of low grade headaches on a daily basis for the past two months, but the headaches went away nearly immediately after taking aspirin.  AR 642.  Dr. Masters suspected the headaches were the result of stress.  *Id.*

With respect to Mr. Washington's mental health, Dr. Masters noted he had mild depression.  AR 640.  He had started taking citalopram but complained that it made him sleepy and did not improve his mood, so he stopped taking it.  *Id.*

### d.  September 11, 2014 chest x-ray

Mr. Washington underwent a chest x-ray on September 11, 2014.  AR 447–48.  The x-ray revealed no abnormalities except "[s]lightly low lung volume" and a "subcentimeter nodular opacity [that] may represent a vessel en-face or atelectasis."  AR 448.  A second x-ray was recommended "with better inspiratory effort to exclude nodular lesion."  *Id.*

Dr. Masters called Mr. Washington on September 12, 2014 to inform him that he needed to repeat the chest x-ray and that he had mild anemia.  AR 481.  She noted that "[o]therwise labs looked good" and that the chest x-ray was "[otherwise] unrema[r]kable."  *Id.*

### e.  September 16, 2014 lung scan and chest x-ray

Mr. Washington underwent a follow-up chest x-ray on September 16, 2014.  AR 446–47.  This x-ray revealed only a "minor abnormality," describing the nodular opacity previously noted in the September 11, 2014 x-ray as "less conspicuous and likely represents pulmonary

vasculature." *Id.*

Mr. Washington also underwent a lung ventilation-perfusion ("VQ") scan on September 16, 2014. AR 445–46. The scan results were "near normal," with a "very mild reduction in perfusion in the lower lobes when compared with the upper lobes [that] may represent sequelae from prior pulmonary embolism." AR 445. The scan results also noted that "[t]he ventilation images are entirely normal." *Id.*

Dr. Masters called Mr. Washington on September 16, 2014 to inform him that the VQ scan was negative and that the chest x-ray did not show any pulmonary nodularity. AR 479. She noted that the lab results showed mild anemia, which she suspected contributed to his fatigue, "but all other tests so far are normal." *Id.*

### f. December 2, 2014 mental medical source statement

On December 2, 2014, Dr. Masters completed a mental medical source statement in support of Mr. Washington's claims for SSI/DIB based on his mental health. AR 751–54. She stated that she had been treating Mr. Washington since January 27, 2012, and that she saw him yearly and as necessary. AR 751.

Dr. Masters identified the following psychological conditions or symptoms as affecting Mr. Washington: depression, loss of interest in activities (anhedonia), memory deficits, decreased energy, problems interacting with the public, difficulty with concentration, feelings of guilt, and lack of attention to details. *Id.* She diagnosed Mr. Washington with depression. *Id.* She indicated that she had been treating Mr. Washington's mental condition with sertraline (Zoloft), and that he had responded to the treatment. *Id.*

Dr. Masters opined that Mr. Washington was mildly limited in his understanding and memory, including his ability to understand and remember both short, simple instructions and detailed instructions. AR 752. She also opined that he experienced both mild and moderate limitations in his ability to sustain concentration and persistence—specifically, he was moderately limited in his ability to sustain an ordinary routine without special supervision, his ability to work in coordination with or proximity to others without being unduly distracted by them, and his ability to make simple work-related decisions. *Id.* Dr. Masters indicated that Mr. Washington's

social interaction abilities were mixed, from no limitations in his ability to get along with coworkers and to maintain socially appropriate behavior and to adhere to basic standards of cleanliness, to mild limitation in his ability to accept instructions and respond appropriately to supervisors' criticism, moderate limitations in his ability to ask simple questions or request assistance, and marked limitations in his ability to interact appropriately with the general public. AR 753. She also stated that she was unaware of any episodes of decompensation. *Id.* Overall, she found Mr. Washington to be moderately limited in his activities of daily living, his social functioning, and his concentration, persistence and pace. *Id.* Dr. Masters did not provide any reasons for her conclusions. AR 752–53.

Dr. Masters opined that the limitations she indicated lasted 12 continuous months or could be expected to last 12 continuous months at the assessed severity. *Id.* at 754. She also stated that Mr. Washington's impairments were likely to produce "good days" and "bad days," and that she estimated that he would be absent from work about four days per month as the result of his impairments. *Id.*

### g.     December 2, 2014 (physical) medical source statement

On December 2, 2014, Dr. Masters completed a medical source statement in support of Mr. Washington's claims for SSI/DIB based on his physical health. AR 755–58. She stated that she had been treating Mr. Washington since January 27, 2012, and that she saw him yearly and as necessary. AR 755.

Dr. Masters diagnosed Mr. Washington with pulmonary embolism, noting symptoms of shortness of breath, fatigue, and coughing. *Id.* As support for her diagnosis, she cited the fact that Mr. Washington had been admitted to Kaiser in December 2013 for a pulmonary embolism with a "mismatched VQ scan." *Id.* She stated that the anticoagulant medication that Mr. Washington had been using to treat his condition could cause serious bleeding problems, but described his prognosis as "good." AR 755–56. Dr. Masters also opined that Mr. Washington's impairment did not last or would not be expected to last least 12 months, stating that he "should be recovered from the pulmonary embolism that caused initial shortness of breath, based on treatment given." AR 756. She identified the following psychological conditions or symptoms as affecting Mr.

9

Washington's physical condition: depression, loss of interest in activities, memory deficits, decreased energy, problems interacting with the public, and difficulty with concentration. *Id.*

Dr. Masters estimated that Mr. Washington's impairment was severe enough to interfere with his attention and concentration occasionally, meaning 6%-33% of the time. *Id.* She estimated that he could walk half a city block without rest or severe pain, and that he could stand for 30 minutes before needing to rest. *Id.* She further estimated that he could sit for eight hours, stand for less than one hour, and walk for one hour total in a workday. *Id.* Dr. Masters opined that Mr. Washington would not need to take unscheduled breaks during a work day, but that he would need to rest for 15-minute periods due to fatigue. AR 757. She stated that, in a competitive work situation, he could lift and carry less than 10 pounds frequently, 10 pounds occasionally, 20 pounds rarely, and never 50 pounds. *Id.* Dr. Masters also opined that Mr. Washington should avoid all exposure to extreme cold, high humidity, cigarette smoke, perfumes, soldering fluxes, fumes, odors, gases, and chemicals; avoid even moderate exposure to extreme heat, solvents and cleaners, and dust; and avoid concentrated exposure to wetness. *Id.*

Dr. Masters stated that Mr. Washington's impairments were likely to produce "good days" and "bad days," and she estimated that he would be absent from work about four days per month as the result of his impairments. *Id.*

### h.    April 21, 2015 visit

Mr. Washington saw Dr. Masters for a follow-up appointment on April 21, 2015. AR 853–55. He complained of fatigue and reported being too fatigued to work, so he just lay around the house for most of the day. AR 853. He also reported experiencing shortness of breath following the pulmonary embolism diagnosis in 2013. *Id.* Dr. Masters noted that Mr. Washington had finished seven months of treatment. *Id.* She also noted that his blood oxygenation levels were 98-100% before and with ambulation. AR 854. She referred him for pulmonary function tests and noted that he had been mildly anemic. AR 855.

With respect to his mental health, Dr. Masters noted that Mr. Washington suffered from mild depression, and that he had tried Celexa and Zoloft with no improvement in mood, so she prescribed him fluoxetine (Prozac) instead. AR 853, 855.

#### i. November 13, 2015 visit

Mr. Washington saw Dr. Masters again on November 13, 2015.  AR 807–08.  He complained of persistent dyspnea on exertion, which he had been experiencing since his treatment for pulmonary embolism from December 2013 to July 2014.  AR 807.  He also reported some pain on the left side of his chest, which he thought was related to heartburn and which he did not experience when suffering dyspnea on exertion.  *Id.*  He agreed to undergo pulmonary testing and a cardiac perfusion scan.  *Id.*

#### j. December 2, 2015 pulmonary function test

On November 23, 2015, Mr. Washington underwent a pulmonary function test.  AR 867.  The test results stated: "The expiratory limb of the flow volume loop is essentially normal.  The inspiratory limb cannot be interpreted due to poor patient effort.  There is no evidence of an obstructive ventilatory defect."  AR 868.  The test also noted that Mr. Washington's baseline oxygen saturation was 95%, and that he was able to ambulate 700 feet without desaturation.  *Id.*

### 4. Nonexamining physician G. Ikawa, M.D.

On November 25, 2014, state agency reviewing physician G. Ikawa, M.D. reviewed Mr. Washington's medical evidence of record and performed a mental residual functional capacity assessment based on Mr. Washington's depression.  AR 67–79.  Dr. Ikawa concluded that Mr. Washington was able to perform and sustain simple repetitive tasks.  AR 71.  Dr. Ikawa opined that Mr. Washington exhibited mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  AR 72.

With respect to Mr. Washington's understanding and memory limitations, Dr. Ikawa stated that his ability to understand and remember very short and simple instructions was not significantly limited, but his ability to understand and remember detailed instructions was moderately limited.  AR 76.

With respect to sustained concentration and persistence limitations, Dr. Ikawa determined that Mr. Washington was moderately limited in his ability to carry out detailed instructions, but that he was not significantly limited in his ability to sustain an ordinary routine without special

1  supervision, his ability to work in coordination with or in proximity to others without being

2  distracted by them, or his ability to make simple work-related decisions.  AR 76.  Dr. Ikawa

3  opined that Mr. Washington was able to carry out simple instructions, to maintain his

4  concentration and attention, to perform within a regular schedule and maintain regular attendance,

5  and to complete a normal workday or work week.  *Id.*

6      Dr. Ikawa stated that Mr. Washington had social interaction limitations but found no

7  significant limitations in any specific respect.  AR 76–77.  Dr. Ikawa noted that Mr. Washington

8  was able to relate appropriately with his supervisors, co-workers, and the general public.  AR 77.

9      Similarly, Dr. Ikawa stated that Mr. Washington had adaptation limitations but found no

10  significant limitations in any specific respect.  *Id.*  Dr. Ikawa noted that Mr. Washington was able

11  to respond and adapt to changes in a work setting.  *Id.*

12      Dr. Paul Klein, PsyD reviewed and affirmed Dr. Ikawa's findings on April 8, 2015.  AR

13  100–01, 104–06, 115.

14      **5.      Treating physician Dana Chiulli, Pharm.D., BCPP**

15      **a.      October 8, 2015 visit**

16      Dr. Chiulli co-signed medical record notes authored by Deborah Pardo, Pharm.D., a

17  psychiatric pharmacy resident who saw Mr. Washington on October 8, 2015.  AR 820–24.  During

18  this visit, Mr. Washington reported to Dr. Pardo that the Prozac prescribed made him more

19  depressed, so he ceased taking it.  AR 820.  He reported his mood as "down" and a "1" on a scale

20  of 1 to 10.  *Id.*  He also described a recent encounter with the San Jose police that culminated in

21  the police placing Mr. Washington on a 72-hour mental health hold because they felt he might

22  have been trying to harm himself.  *Id.*  Mr. Washington denied any suicidal ideation and stated

23  that he did not feel like he needed to be hospitalized.  *Id.*  He reported anxiety about his living

24  situation at a shelter and felt fear and discomfort about leaving it for permanent housing.  AR 820–

25  21.  He reported low energy and that after walking up the hill to the shelter, he lacked the energy

26  to go out again.  AR 821.  He also reported poor memory and slow thinking.  *Id.*  Dr. Pardo noted

27  that Mr. Washington had "failed trial of 3 SSRIs so appropriate to switch to another antidepressant

28  class" and that he "may benefit from trial of venlafaxine to target anxiety and mood."  AR 822.

### b. January 15, 2016 visit

Dr. Chiulli saw Mr. Washington again on January 15, 2016 for a 30-minute medication consult. AR 779–82. She noted that she had last seen him on August 26, 2015, and that Mr. Washington had not come to several follow-up appointments thereafter. AR 779. Dr. Chiulli described his mood as "'normal', restricted," but Mr. Washington described his mood to her as "up and down," with an equal number of good days and bad days, and that he experienced anhedonia and crying spells. AR 779, 781. Mr. Washington reported auditory hallucinations, which he associated with use of methamphetamines (his last use having been the previous week), and that he occasionally experienced religious preoccupation and delusional thought content even when sober. AR 780. Dr. Chiulli noted that Mr. Washington was not currently taking any psychotropic medications, although he had previously been prescribed citalopram, fluoxetine, sertraline (which was "not beneficial"), and venlafaxine (Effexor). AR 780, 782. She suggested that Mr. Washington try ziprasidone, which he agreed to do. AR 781–82.

### B. Self-Reported and Other Source Evidence

#### 1. Mr. Washington's function reports

##### a. October 6, 2014 report

On October 6, 2014, Mr. Washington completed a function report. AR 223–31. He stated that he lived alone in an apartment. AR 223. He described the following conditions as limiting his ability to work: inability to stand or walk for long periods of time, shortness of breath, chest pain while walking or standing, severe depression, and memory shortness. *Id.* These conditions affected his ability to lift, squat, bend, stand, reach, walk, sit, and climb stairs, as well as his memory, ability to complete tasks, concentration, and understanding. AR 228. He stated that he could hardly lift anything and that he was unable to walk for more than 10 minutes at a time before he needed to rest. *Id.* He stated that he could only pay attention for maybe five minutes, but that he was able to finish what he started, such as a conversation, chores, or a movie. *Id.* He also indicated that he was better with spoken instructions than written instructions, but needed them repeated a few times. *Id.*

Mr. Washington stated that his daily activities consisted of lying down all day. AR 224.

He had no problem with personal care, such as hygiene and grooming, and that he used an alarm clock to remind himself to take his medication. AR 224–25. He stated that he prepared his own meals such as sandwiches, cold cuts, vegetables and fruits, and frozen dinners, but that he only did so twice a week due to a lack of energy. AR 225. He also indicated that he was able to wash dishes with a dishwasher, but he had to rest after 15-minute periods because of his fatigue. AR 225–26.

Mr. Washington stated that he did not go outside unless he had to, and he drove a car. AR 226. He did not go anywhere on a regular basis, except for the store. AR 227. He stated that he could shop for basic foods online using a computer, which would take him two hours. He was able to pay bills and count change, but he did not have a savings account and did not use a check book or money orders, and instead using the Internet. AR 226.

Mr. Washington listed no hobbies or interests other than watching a lot of television, which he did frequently. AR 227. He stated that he slept a lot since the onset of his conditions. *Id.* He stated that he did not spend time with others (except perhaps for an hour a day) and had no problems with family, friends, or others because he did not associate with them. AR 227–28. He did not report any problems with authority figures. AR 229. He stated that he did not handle stress or change well at all, and that he feared everything. *Id.*

### b. February 3, 2015 report

Mr. Washington completed a second function report on February 3, 2015.[5] He stated that he lived alone in an apartment. AR 272. He described the following conditions as limiting his ability to work: inability to stay on his feet for long periods of time, shortness of breath, shortness of memory, and an injured left foot that required him to walk with a cane. *Id.* These conditions affected his ability to lift, bend, stand, walk, kneel and climb stairs, as well as his memory, ability to complete tasks, concentration, understanding, following instructions, ability to use his hands,

---

[5] The record appears to be missing the last page of Mr. Washington's second function report, and therefore that second report does not state a date on its face. *See* AR 272–79 (second function report including only pages 1 through 8 of 9); *compare* AR 223–31 (first report including pages 1 through 9 of 9). The list of exhibits attached to the ALJ's opinion indicates that Mr. Washington completed this second function report on February 3, 2015. AR 42.

and ability to get along with others.  AR 277.  He stated that he was unable to walk for more than 10 minutes at a time before he needed to rest for 15 minutes.  *Id.*  He stated that he could only pay attention for maybe five minutes and that he could not finish what he started, such as a conversation, chores, or a movie.  *Id.*  He also indicated that he did not follow written instructions well and that his short attention span affected his ability to follow spoken instructions.  *Id.*  Before the onset of his conditions, he stated that he was able to stand for long periods of time and was better able to remember things.  AR 273.

Mr. Washington stated that his daily activities consisted of getting up, taking a shower, and then lying on his sofa and watching television until bedtime.  *Id.*  He had no problem with personal care, such as hygiene and grooming, except that he needed to sit on the bed to dress and limited his bathing time to less than 10 minutes.  *Id.*  He stated that he was able to prepare his own meals but that he snacked all day.  AR 274.  His fatigue prevented him from preparing meals sometimes.  *Id.*  He also indicated that he was not able to do much with respect to household chores because he tired too quickly and he was depressed.  AR 275–76.

Mr. Washington stated that he did not go outside often and only when he had to, and he drove a car.  AR 275.  He did not go anywhere on a regular basis.  AR 276.  He stated that he could shop for food, clothing, shoes, and medication in stores and online using a computer, which did not take him long.  AR 275.  He was able to pay bills and count change, but he did not have a savings account or use a check book or money orders and instead used a debit card.  *Id.*

Mr. Washington listed no hobbies or interests other than watching television, which he would do all day until bedtime.  AR 276.  He stated that he did not spend time with others and had no problems with family, friends, or others because he did not have family nearby.  AR 276–77.  He noted that he had "turned into more of a recluse" and had become even more depressed over time.  AR 277.  He did not report any problems with authority figures.  AR 278.  He stated that he did not handle stress well at all, that he hated change, and that he had a tendency to fear everything.  *Id.*

Finally, Mr. Washington noted that he had suffered a fall and sustained a foot injury for which his doctor had prescribed a cane to assist him in walking.  AR 278.

15

### 2. Ronnette White, M.S.W., L.I.S.W.

Ms. White is a clinical social worker who was assigned to be Mr. Washington's Mental Health Treatment Coordinator at the San Jose VA Clinic after he stated that his medication was not working and requested a mental health consult on October 2, 2014. AR 705.

#### a. October 27, 2014 visit

Mr. Washington met with Ms. White for the first time on October 27, 2014 for mental health counseling. AR 698–704. He informed her that he had "[n]o energy or motivation to do anything" and that he watched a lot of television or slept for most of the day. AR 698. In describing his personal history, Ms. White noted that he "endorsed symptoms consistent with depression at an early age." AR 701. She described his mood as "mildly depressed," and he denied suicidal ideation. AR 702–03. Mr. Washington agreed to meet for bi-weekly counseling sessions. AR 703.

#### b. November 5, 2014 visit and treatment plan

Ms. White entered an initial mental health treatment plan for Mr. Washington on November 5, 2014. AR 695–97. She noted that he had problems with depression, sadness, and fear. AR 697. She also noted that he reported "no energy or motivation to do anything," and that he watched television or slept for most of the day. AR 696–97. She referred him to weekly individual cognitive behavioral therapy sessions twice a month for six months. AR 697. She noted that there was no evidence Mr. Washington suffered from delusions, hallucinations, or psychosis. *Id.*

#### c. November 19, 2014 visit

Ms. White saw Mr. Washington for 30 minutes on November 19, 2014. AR 866. They reviewed the overall goal of cognitive behavioral therapy and its benefits—specifically, reducing feelings of depression and anxiety. *Id.*

#### d. December 3, 2014 visit

Ms. White saw Mr. Washington for 30 minutes on December 3, 2014. AR 865–66. They reviewed the overall goal of cognitive behavioral therapy and its benefits—specifically, reducing feelings of depression and anxiety. AR 866.

### e. January 7, 2015 visit

Ms. White saw Mr. Washington for 30 minutes on January 7, 2015. AR 860–61. Mr. Washington stated that he would like a change in his antidepressant medication. AR 861. Ms. White advised him to speak to his prescribing physician. *Id.*

### f. January 21, 2015 visit

Ms. White saw Mr. Washington for one hour on January 21, 2015. AR 858–60. Mr. Washington stated that he was taking his antidepressant medication but may need a change. AR 859. Ms. White advised him to speak to his prescribing physician. *Id.*

### g. February 25, 2015 visit

Ms. White saw Mr. Washington for one hour on February 25, 2015. AR 857–58. Mr. Washington stated that he was not taking his antidepressant medication as prescribed and admitted to taking methamphetamines, which caused him to have hallucinations, paranoia, and delusional thoughts. AR 858. She described him as "making gains with learning cognitive behavioral therapy strategies" and planned to continue with the current course of treatment. *Id.*

### h. March 11, 2015 visit

Ms. White saw Mr. Washington for one hour on March 11, 2015. AR 855–56. She noted that he was receiving medication from his primary care provider and that he stated he was taking it. AR 856. She described him as "engaged and appears to be benefitting from CBT therapy." *Id.*

### i. April 23, 2015 visit

Ms. White met with Mr. Washington on April 23, 2015 for a mental health counseling session. AR 851–53. He indicated that he was interested in discussing medication with his mental health provider. AR 852. He also expressed concern about housing and finances and the possibility of being unable to continue with therapy. *Id.*

### j. June 1, 2015 visit

Ms. White saw Mr. Washington again on June 1, 2015. AR 846–48. He reported that he had "no energy or motivation to do anything" and that he watched a lot of television or slept most of the day. AR 846. She referred him to weekly individual cognitive behavior therapy twice a month for six months. AR 848.

### k. July 16, 2015 visit

Ms. White saw Mr. Washington for 30 minutes on July 16, 2015. AR 833–35. He indicated to her that he was interested in medication to address his depression. AR 834. Ms. White notes that Mr. Washington had been diagnosed with recurrent, moderate major depressive disorder. *Id.* Mr. Washington stated that he was currently using methamphetamines and had been doing so regularly since becoming homeless two months prior. *Id.* Ms. White also noted that she had been working with Mr. Washington since 2014 and that he had made some gains with cognitive behavioral therapy, although he possibly experienced some psychosis. *Id.* Her notes state that her treatment plan for Mr. Washington was completed in June 2015, and she encouraged Mr. Washington to follow up with another social worker for support. *Id.*

### 3. Tyler Sussex, M.S.W.

Mr. Sussex is a clinical social worker who replaced Ms. White as Mr. Washington's Mental Health Treatment Coordinator at the San Jose VA Clinic. AR 799.

### a. December 3, 2015 visit

Mr. Washington and Mr. Sussex met for the first time on December 3, 2015, and they discussed Mr. Washington's housing situation, his substance abuse, and his mental health symptoms. AR 794–95. Mr. Washington stated that he smoked methamphetamine three to four times a month and was ambivalent about quitting. AR 794. He reported auditory and visual hallucinations only while using methamphetamine, and reported being in a better mood recently and not noticing his depression symptoms as often. *Id.* Mr. Washington also reported that he had stopped taking his antidepressants two weeks before the visit. *Id.* He indicated that he continued to attend substance abuse rehabilitation treatment three to four times a week. AR 795.

### b. December 16, 2015 visit

Mr. Sussex met with Mr. Washington for 30 minutes on December 16, 2015. AR 790–92. Mr. Washington informed Mr. Sussex that he had been sober for four days and expressed a desire to quit. AR 790–91. Mr. Washington also reported that he was not taking his psychotropic medication as prescribed and denied any auditory or visual hallucinations while sober. AR 791. Mr. Sussex scheduled a follow-up appointment for Mr. Washington on December 30, 2015, but

the record contains no information about whether that Mr. Washington saw Mr. Sussex for that appointment. *Id.*

### C. Administrative Proceedings

Mr. Washington's applications for SSI and DIB were denied initially and upon reconsideration. AR 127, 137. He requested a hearing before an ALJ. At the hearing, the ALJ received testimony from Mr. Washington and a vocational expert.

#### 1. Mr. Washington's testimony

Mr. Washington testified about his living situation and daily activities, his symptoms, and his work history. AR 48–60.

With respect to his mental conditions and symptoms, Mr. Washington testified that he heard voices, for which he was seeing a psychiatrist on a regular basis and also taking medication that made him feel "loopy." AR 49–50. He stated that he used to hear voices on a daily basis, but since he began his current medication, he heard them about three times a week. *Id.* at 50.

Mr. Washington described his depression symptoms as follows:

> A. With the depression, I don't want to go outside. I won't go outside. I might end up leaving my job for no reason, you know, just getting up and leaving because, you know, of the – of my mental condition. But the depression, I don't shower, I don't shave, I don't get up and I'm in bed all day. And this can happen as long as a week's time . . . until I can see my doctor.

AR 51. He stated that such a depressive period happens at least twice a month. *Id.* He also testified that he feared going outside because he thought someone might kill him. Mr. Washington testified that he was getting help for his mental and substance abuse problems by going to group therapy sessions at the VA and the Recovery Café on a daily basis, which he felt was very helpful. AR 51–52. He also testified that he had tried several different medications for his symptoms, but that the first few did not work at all. AR 50. He stated that his depression and auditory hallucinations occurred while sober, although they were less intense than when he was using methamphetamine. AR 52–53.

With respect to his physical condition, Mr. Washington testified that ever since he suffered a pulmonary embolism "a couple years back," he had been experiencing shortness of breath and

was unable to stand or walk for periods of time longer than 15 minutes. AR 54–55. After about 15 or 20 minutes of standing or walking, he would have to sit down. AR 56 ("I have to sit down, or if I'm walking down the street and there's nowhere to sit down, I have to stop and bend over to catch my breath. Otherwise I get lightheaded and feel like I'm passing out."). Mr. Washington testified that he would need to rest for about five minutes to recover from the "drowsiness" or "loopiness." *Id.* He also testified that he experienced headaches at least two or three times a week, which he attributed to the pulmonary embolism. AR 55. He testified that medication such as ibuprofen would relieve the headaches "some." *Id.* Mr. Washington also testified that since the pulmonary embolism, he had difficulty concentrating for long periods of time and had a very short attention span. AR 57–58.

Mr. Washington also testified that he fell down the stairs over a year before and injured his foot. AR 53. He was prescribed ibuprofen for the pain as well as a cane for walking, which he also used while standing and while at home. AR 53–54. He testified that his foot "gives out" often, causing further problems with standing and walking. AR 54. Mr. Washington also stated that as the result of his foot injury, he also had a problem with his pelvis that caused him pain when standing up or sitting down. *Id.* He testified that if he sat for too long, his pelvis would lock up, and he would have to stand up very slowly using the cane to assist him. AR 57.

Mr. Washington also testified about his daily activities:

> Q. And what do you usually do in an average day?
>
> A. I try to get up in the morning and then I get on the light rail and go to the VA, and attend one of the groups. And then I come home and rest awhile. And then I'll take – if I need to pay a – to do something, other than that, I'll go to the Recovery Café, for a class which is right across the street from me, right behind City Hall. . . . So I'll go over there and sit around over there for a while.

AR 58. He stated that he would take a bus or the light rail to his group therapy sessions, as he no longer owned a car. AR 49, 52. He stated that he lived alone in a handicap apartment and cooked for himself. AR 48–49. He testified that it took him about 20 minutes to prepare a meal, depending on what he was cooking. AR 59. Mr. Washington stated that he was able to do household chores, such as vacuuming, in 10- or 15-minute increments due to his fatigue and

shortness of breath. AR 59. He also testified that he could bathe himself as long as it was within a 15-minute period. *Id.* He also stated that he avoided lifting anything due to his foot and pelvis injuries, and because of the dizziness or "loopiness" from his medication. AR 57.

Mr. Washington stated that his only social interaction was group therapy, "because I don't socialize with anybody. I have a tendency of staying inside. I'm a loner. . . . And I'm afraid to make friends . . . ." AR 60. He described himself as an introvert who did not have any hobbies. *Id.*

### 2. Vocational expert testimony

Vocational expert Darlene MacQuary testified at the hearing. AR 61–65. She provided the ALJ with a description of Mr. Washington's previous jobs and confirmed that all of his previous jobs were either skilled or semi-skilled work. AR 61–64.

In response to questioning from Mr. Washington's counsel, Ms. MacQuary testified that a person with moderate[6] difficulties in his abilities to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being unduly distracted by them, to make simple work-related decisions, and to ask simple questions or request assistance would be unable to perform Mr. Washington's past relevant work. AR 64–65. She also testified that, on average, a person working Mr. Washington's past jobs could miss no more than two days of work per month. AR 65. Finally, she testified that a person who had to use a cane for standing and walking could perform sedentary jobs. *Id.*

### 3. The ALJ's decision

At step one of the sequential analysis, the ALJ found that Mr. Washington had not engaged in substantial gainful activity since the alleged onset date of November 15, 2013. AR 30.

At step two, the ALJ found that although Mr. Washington's pulmonary embolism qualified as a severe impairment, his depression did not. AR 30, 32. The ALJ found that Mr. Washington's

---

[6] When examining Ms. MacQuary, Mr. Washington's counsel defined "moderate" as "15-20% of an eight-hour workday or a forty-hour workweek." AR 64. Dr. Masters's opinion defines "moderate" as "[a]ble to perform designated work-related mental functions, but will have limitations that impair the effective performance of the task incrementally for a total between 11% and 20% of an 8-hour workday or 40 hour workweek." AR 752.

foot injury, hip pain, obesity, and methamphetamine abuse did not support more than minimal limitations. AR 31–32.

The ALJ additionally found that Mr. Washington's depression and anxiety did not qualify as a severe impairment, stating that Mr. Washington's "medically determinable mental impairments of depression and anxiety do[] not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore non-severe." AR 32. The ALJ engaged in the paragraph B analysis and found that Mr. Washington did not satisfy the paragraph B criteria. Specifically, the ALJ found that Mr. Washington was only mildly limited in activities of daily living, because he was responsible for his own personal care, prepared his own meals, and performed all of his chores without limitation except for needing to perform them in 10 to 15-minute increments. *Id.* The ALJ also noted that Mr. Washington was able to go out alone, to shop at stores and online, and to attend his daily therapy groups by taking public transportation. *Id.* With respect to social functioning, the ALJ found that Mr. Washington was only mildly limited, because although he did not spend time with others, he also testified that he attended daily group meetings after taking public transportation, that he reported having no difficulty getting along with authority figures or others, and that he performed some volunteer work. *Id.* With respect to concentration, persistence, and pace, the ALJ again found only mild limitation. Although Mr. Washington reported difficulty with concentrating, instructions, stress, changes in routine, and his memory, the ALJ stated that "he did not have significant mental status findings throughout the record and was noted to be cooperative." *Id.* The ALJ additionally noted that Mr. Washington "was not on psychotropic medications for the majority of the record." *Id.* Finally, the ALJ found no indication of any episodes of decompensation in the medical record.

In his step two analysis, the ALJ considered the mental medical source opinions from Drs. Masters and Ikawa. AR 33–34. The ALJ gave Dr. Masters's opinion "little weight," because he found it "inconsistent with the medical record indicating inconsistent and sporadic psychiatric treatment without even consistent psychotropic medication treatment, but no significant mental status findings, and the claimant's high activities of daily living throughout the record." AR 33. The ALJ took particular notice of Dr. Masters's description in her treatment notes of Mr.

22

Washington's depression as "mild," which he found inconsistent with her opinion as to his limitations.  *Id.*  Similarly, the ALJ gave "little weight" to Dr. Ikawa's opinion that Mr. Washington was moderately limited in his ability to understand, remember, and carry out detailed instructions.  AR 34.  The ALJ found Dr. Ikawa's opinion also to be "inconsistent with the medical record indicating inconsistent and sporadic psychiatric treatment without even consistent psychotropic medication treatment, but no significant mental status findings, and the claimant's high activities of daily living throughout the record."  *Id.*

At step three, the ALJ determined that Mr. Washington did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).  AR 34.

At step four, the ALJ determined that Mr. Washington has the RFC to perform the full range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b).  *Id.*  The ALJ found that Mr. Washington's medically determinable impairments could reasonably be expected to cause the symptoms he alleged, but that he found Mr. Washington's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible.  AR 35. Specifically, the ALJ cited inconsistencies in the record that demonstrated that Mr. Washington's activities of daily living were "greater than one would expect" for a person who claimed to be unable to work: he was responsible for his own personal care, prepared his own meals, performed all of his chores without limitation except for needing to perform them in 10 to 15-minute increments.  *Id.*  The ALJ also noted that Mr. Washington had been able to drive for the majority of the record, to go out alone, to shop at stores and online, to attend his daily therapy groups by taking public transportation, and to perform volunteer work.  *Id.*

The ALJ also found that Mr. Washington's medical records described "conservative treatment" for his pulmonary embolism and did not support Mr. Washington's claims of severe disability.  AR 35–37.  Specifically, the ALJ noted the following evidence from the record:

- Mr. Washington reported improved symptoms to Dr. Masters when he met her for a follow-up appointment on December 6, 2014, only three days after he was released

from the hospital. AR 35.

- Mr. Washington was advised to take over-the-counter pain medication for his headaches. AR 36.

- On February 7, 2014, Mr. Washington saw Dr. Masters and reported low energy, anhedonia, and decreased motivation. He continued to take warfarin, but denied chest pain or shortness of breath. Mr. Washington admitted to obtaining hormonal therapy "online" for three years to treat his gender dysmorphia and requested hormone therapy through the VA, which Dr. Masters advised was an absolute contraindication due to his pulmonary embolism. Mr. Washington declined a mental health referral, although Dr. Masters prescribed him citalopram for his mild depression. Dr. Masters advised him that he could return to work when he felt physically able to perform his tasks. *Id.*

- Mr. Washington continued to follow up with the anticoagulation clinic, and his INR levels remained within the target range. He was advised to stop taking warfarin on June 4, 2014. *Id.*

- On September 11, 2014, Mr. Washington saw Dr. Masters, complaining of intermittent extreme exhaustion and substernal chest pain. He reported feeling very fatigued while moving short distances, but denied pleuritic chest pain and had much less severe symptoms compared to December 2013. He also reported low grade headaches occurring daily beginning two months prior. He ceased taking citalopram because it did not help his mental condition and instead caused drowsiness. Dr. Masters noted that his pulmonary embolism was likely related to exogenous estrogen. *Id.*

- On September 16, 2014, Mr. Washington underwent a chest x-ray and lung VQ scan, which were negative for any significant findings. Mr. Washington reported ongoing fatigue, which Dr. Masters suspected to be the result of mild anemia. Thereafter, Mr. Washington did not present for many months with related symptoms or for treatment. *Id.*

- On April 21, 2015, Mr. Washington saw Dr. Masters and reported fatigue and lying around his home for most of the day. He reported ongoing shortness of breath since

24

the pulmonary embolism, although his oxygen saturation levels were normal with ambulation at the office. Dr. Masters ordered pulmonary function testing and other lab tests based on mild anemia. *Id.*

- On November 23, 2015, Mr. Washington underwent pulmonary function testing, with no significant findings. He ambulated for 700 feet without desaturation. He did not present or seek treatment for symptoms related to the pulmonary embolism thereafter. AR 37.

Overall, the ALJ concluded that Mr. Washington's pulmonary embolism symptoms were well-controlled after six months of warfarin treatment, and that Mr. Washington remained stable with treatment. *Id.* No objective medical findings supported his reports of fatigue. *Id.* The ALJ noted that Mr. Washington "infrequently reported" headaches, but the symptoms were mild and required no prescription medication. *Id.* The ALJ also found that although Mr. Washington alleged that his medication made him drowsy, the medical records showed only that one of his previous medications made him sleepy and was therefore discontinued, and that Mr. Washington did not take psychotropic medications for the majority of the record since the alleged onset date. *Id.*

Additionally, in his step four analysis, the ALJ gave Dr. Masters's opinion concerning Mr. Washington's pulmonary embolism "little weight," because he found "the extreme opinions . . . inconsistent with her own medical record note clearing [Mr. Washington] to begin work as early as February 2014, and [Mr. Washington's] Warfarin treatment [that lasted] for only six months." *Id.* The ALJ also found Dr. Masters's opinion inconsistent with Mr. Washington's "infrequent and conservative treatment for his symptoms" since his initial hospitalization for pulmonary embolism, "with no objective findings other than mild anemia, and his high activities of daily living throughout the record." *Id.*

Based on the above analysis, the ALJ concluded that Mr. Washington was not disabled and that he was capable of performing his past work as an accounts payable clerk. AR 38.

The Appeals Council denied Mr. Washington's request for review, and the ALJ's decision became the Commissioner's final decision. Mr. Washington now seeks judicial review, arguing that the ALJ erred by (1) improperly discounting the opinions of Drs. Masters and Ikawa

concerning Mr. Washington's depression at step two; (2) improperly discounting Dr. Masters's opinion concerning Mr. Washington's pulmonary embolism condition at step four; and (3) improperly assessing Mr. Washington's own reports of the severity of his symptoms. The Commissioner contends that the ALJ's decision is correct and free of legal error.

### III.   STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has the authority to review the Commissioner's decision to deny benefits. The Commissioner's decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Moncada v. Chater*, 60 F.3d 521, 523 (9th Cir. 1995). In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance—it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." *Moncada*, 60 F.3d at 523; *see also Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992). When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. *Drouin*, 966 F.2d at 1257; *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). Where evidence exists to support more than one rational interpretation, the Court must defer to the decision of the Commissioner. *Moncada*, 60 F.3d at 523; *Drouin*, 966 F.2d at 1258.

### IV.   DISCUSSION

Mr. Washington contends that the ALJ erred in two main respects. First, he argues that the ALJ erred at step two by failing to classify his mental impairment as severe. Second, Mr. Washington argues that the ALJ erred at step four in finding Mr. Washington's testimony concerning the severity of his pulmonary embolism symptoms to be less than credible and in discounting Dr. Masters's opinion concerning his pulmonary embolism.

#### A.   The ALJ's Step 2 Analysis of Mr. Washington's Mental Impairment

To assess the severity of Mr. Washington's depression, the ALJ was required to analyze the four areas of functional limitations in paragraph B as described in 20 C.F.R. Part 404, Subpart P, Appendix 1, section 12.00C: activities of daily living; social functioning; concentration,

United States District Court
Northern District of California

persistence, or pace; and episodes of decompensation. Here, the ALJ conducted the requisite paragraph B analysis, finding mild limitations in the first three areas and no episodes of decompensation. AR 32–33.

Mr. Washington does not assert that the ALJ committed error in conducting the paragraph B analysis, but rather focuses on the ALJ's assignment of little weight to the opinions of Drs. Masters and Ikawa. Dkt. No. 25 at 4–7. The Commissioner maintains that the ALJ properly assessed the severity of Mr. Washington's mental impairment and assigned the appropriate weight to the opinions of Drs. Masters and Ikawa. Dkt. No. 30 at 6–10.

"Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Id*.

### 1. Dr. Masters's opinion

The ALJ gave little weight to the opinion Dr. Masters expressed in her December 2014 mental medical source statement because he found it inconsistent with the medical record showing inconsistent and sporadic psychiatric treatment with no consistent psychotropic medication treatment, no significant mental status findings, and Mr. Washington's "high activities of daily living throughout the record." AR 33. The ALJ also noted that Dr. Masters's opinion was inconsistent with entries in Mr. Washington's medical records—including entries by Dr. Masters herself—noting that his depression was only mild. *Id*.

A treating physician's opinion is entitled to "controlling weight" if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. §§ 416.927(c)(2), 404.1527(c)(2) (2016).[7]

---

[7] Although the Commissioner's rules and regulations regarding the evaluation of medical evidence were revised in 2017, there appears to be no dispute that those revisions do not apply to Mr. Washington's claims, which were filed before those revisions went into effect.

"However, '[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.'" *Bray v. Comm'r of Social Security Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (quoting *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002)).

When an ALJ gives a treating physician's opinion less than controlling weight, the ALJ must do two things. First, the ALJ must consider other factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the physician. 20 C.F.R. § 416.927(c)(2)-(6) (2016); *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (citing 20 C.F.R. § 404.1527(c)(2)-(6)). Consideration must also be given to other factors, whether raised by the claimant or by others, or if known to the ALJ, including the amount of relevant evidence supporting the opinion and the quality of the explanation provided; the degree of understanding a physician has of the Commissioner's disability programs and their evidentiary requirements; and the degree of his or her familiarity with other information in the case record. 20 C.F.R. §§ 416.927(c)(6), 404.1527(c)(6) (2016); *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). The failure to consider these factors, by itself, constitutes reversible error. *Trevizo*, 871 F.3d at 676.

Second, the ALJ must provide reasons for rejecting or discounting the treating physician's opinion. The legal standard that applies to the ALJ's proffered reasons depends on whether or not the treating physician's opinion is contradicted by another physician. When a treating physician's opinion is not contradicted by another physician, the ALJ must provide "clear and convincing" reasons for rejecting or discounting the opinion, supported by substantial evidence. *Id.* at 675. When a treating physician's opinion is contradicted by another physician, an ALJ must provide "specific and legitimate reasons" for rejecting or discounting the treating physician's opinion, supported by substantial evidence. *Id.* "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quotations and citation omitted).

With respect to the ALJ's first responsibility—consideration of other factors—the ALJ did

not consider all the factors he was required to consider under 20 C.F.R. § 416.927(c)(2)-(6) and 20 C.F.R. § 404.1527(c)(2)-(6). 20 C.F.R. § 416.927(c) ("Unless we give a treating source's medical opinion controlling weight under paragraph (c)(2) of this section, we consider *all* of the following factors in deciding the weight we give to any medical opinion.") (emphasis added); 20 C.F.R. § 404.1527(c) (same); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) ("The ALJ is required to consider the factors set out in 20 C.F.R. § 404.1527(c)(2)-(6) in determining how much weight to afford the treating physician's medical opinion.") Although the ALJ noted that Dr. Masters was Mr. Washington's primary care physician and had been treating Mr. Washington since January 27, 2012 at the time she wrote her opinion in December 2, 2014, he did not discuss her specialization (if any), the frequency of examination[8], or the nature and extent of the treatment relationship. AR 33. As a result, it is unclear to what extent, if any, the ALJ considered those other factors and how those factors informed the ALJ's decision to give Dr. Masters's opinion little weight. *See Trevizo*, 871 F.3d at 676 (holding that failure to consider 20 C.F.R. § 404.1527(c) factors alone constitutes reversible error).

With respect to the ALJ's second responsibility—providing reasons for rejecting or discounting the treating physician's opinion—the ALJ did not expressly find that any other physician contradicted Dr. Masters's opinion.[9] When a treating physician's opinion is not

---

[8] The ALJ noted that in Dr. Masters's medical source statement concerning Mr. Washington's pulmonary embolism condition, she stated she saw him on an annual basis. AR 37. However, the medical record indicates that beginning on December 6, 2013, Dr. Masters saw Mr. Washington again on February 7, 2014, September 11, 2014, April 21, 2015, and November 13, 2015. They discussed Mr. Washington's depression on February 7, 2014, September 11, 2014, and April 21, 2015. *See supra* Section II.A.3.

[9] It appears that Dr. Ikawa's opinion was at least somewhat inconsistent with Dr. Masters's opinion. *See Trevizo*, 871 F.3d at 676 (inferring from the record that treating physician's opinion was inconsistent with nonexamining physician's opinion); *see also Lapuz v. Berryhill*, 740 F. App'x 596, 597 (9th Cir. 2018) (citing *Trevizo* for the proposition that the "specific and legitimate standard for contradicted medical opinions applies when this court can infer from the record that a medical opinion is contradicted"). Dr. Masters stated that Mr. Washington exhibited moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate deficiencies of concentration, pace, and persistence, whereas Dr. Ikawa opined that Mr. Washington was only mildly limited in the first two categories. *Compare* AR 72 *with* AR 753. However, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." *Lester*, 81 F.3d at 831 (emphasis original). Even if the ALJ had expressly found that Dr. Ikawa's opinion contradicted Dr. Masters, the ALJ nevertheless provided clear and convincing

contradicted by another physician, the ALJ must provide "clear and convincing" reasons for rejecting or discounting the opinion, supported by substantial evidence. *Id.* at 675.  The ALJ provided three reasons for discounting Dr. Masters's opinion: (1) her opinion was inconsistent with the medical record indicating "inconsistent and sporadic psychiatric treatment without even consistent psychotropic medication treatment, but no significant mental status findings"; (2) her opinion was inconsistent with Mr. Washington's "high activities of daily living"; and (3) her opinion was inconsistent with treatment notes describing Mr. Washington's depression as mild. AR 33.  The Court addresses each in turn.

### a. Inconsistent and sporadic psychiatric treatment and medication, no significant mental health findings

The ALJ concluded that the record evidence indicates "inconsistent and sporadic psychiatric treatment."  It is unclear from the record whether Mr. Washington ever saw a psychiatrist.  However, Mr. Washington did receive relatively consistent mental health treatment and therapy between February 7, 2014 and January 15, 2016.  Mr. Washington first obtained mental health treatment from the VA in February 2014, when Dr. Masters prescribed him citalopram for his depression.  AR 500–02, 720.  He met with social workers for bi-weekly mental health counseling sessions from at least October 2014 to January 2015.  AR 689, 691, 694–95, 702–03, 705.  Throughout 2015, he saw Dr. Masters, various social workers, mental health clinical pharmacy specialists, and staff psychologists concerning his depression and attempts to treat it with medication on at least an approximate quarterly basis.  *Id.*; *see also* AR 791, 803, 820–24, 831, 834, 840, 853, 855 (listing appointments on January 7, January 21, April 21, July 16, July 21, October 8, November 18, and December 16).  He also testified that he attended group therapy sessions at the VA and the Recovery Café on a daily basis, although the record is not clear on when he began doing so.  AR 52, 58.  The ALJ's decision does not indicate whether he considered this substantial record evidence of mental health treatment that Mr. Washington received through the VA.

---

reasons based on substantial evidence for discounting Dr. Masters's opinion, as discussed below. *See infra* Section IV.A.1.c.

United States District Court
Northern District of California

Contrary to the ALJ's findings, the record does not indicate a lack of consistent psychotropic medication treatment; rather, it indicates a lack of consistently *effective* medication treatment. Under the supervision of Dr. Masters and other medical professionals, Mr. Washington tried at least three different antidepressants between February 7, 2014 and January 15, 2016, none of which improved his depression. AR 720, 780–82, 820–22. The medical records include references to Mr. Washington stating that he was not taking his antidepressants. AR 640, 791. However, on at least one of these occasions, he ceased taking the medication because he said it offered him no relief and, in fact, exacerbated his depression. AR 640, 820–22; *see also Byrnes v. Shalala*, 60 F.3d 639, 641 (9th Cir. 1995) ("The SSA regulations provide that if a claimant 'do[es] not follow the prescribed treatment without a good reason,' he will be found not disabled. . . . However, before basing a denial of benefits on noncompliance, the ALJ must 'examine the medical conditions and personal factors that bear on whether [a claimant] can reasonably remedy' his impairment and must make specific findings.'") (internal citation omitted). At the hearing, Mr. Washington testified that he had recently been prescribed a new medication that "seem[ed] to work a little bit better," although it made him feel "loopy." AR 50. The ALJ did not consider or discuss either Mr. Washington's mental health condition or other factors in evaluating his purported non-compliance with prescribed medication treatment.

Finally, it is unclear precisely what the ALJ meant when he concluded that the medical record contained "no significant mental status findings." Mr. Washington's Mental Health Treatment Coordinator described him as having major depressive disorder, but Dr. Masters repeatedly described Mr. Washington in the medical records as only "mildly depressed." *Compare* AR 703, 834, 856, 858 ("Diagnosis: Major Depressive Disorder, recurrent, moderate") *with* AR 640, 719, 853 (describing "[m]ild depression"). Mr. Washington also informed his medical providers that he had been placed on a 72-hour involuntary mental health hold in July 2015 because the police believed he would harm himself, although he consistently disavowed any kind of suicidal thoughts or plans to his medical providers. AR 651, 694, 702, 718, 791, 803, 820, 822, 840.

In discussing these bases for discounting Dr. Masters's opinion, the ALJ did not cite to any

specific evidence in the record. Accordingly, to the extent the ALJ rejected Dr. Masters's opinion based on the medical record showing "inconsistent and sporadic psychiatric treatment without even consistent psychotropic medication treatment, but no significant mental status findings," the Court finds that such a conclusion is not based on substantial evidence.

### b. Mr. Washington's daily activities

A conflict between a treating physician's opinion and a claimant's daily activities may justify discounting the treating physician's opinion. *Ghanim*, 763 F.3d at 1162 (citing *Morgan*, 169 F.3d at 600–02); *Doney v. Astrue*, 485 F. App'x 163, 165 (9th Cir. 2012) (finding ALJ's rejection of treating physician's opinion was based on clear and convincing reasons because, among other issues, the opinion was inconsistent with claimant's activities of daily living and treating physician's own treatment records). In discounting Dr. Masters's opinion, the ALJ relied on evidence of Mr. Washington's "high activities of daily living throughout the record." AR 33. For this conclusion, the ALJ relied solely on Mr. Washington's own descriptions of his activities of daily living as reflected in his function reports and his hearing testimony. AR 32 (citing AR 223–31, 272–79). Mr. Washington stated in his function reports and hearing testimony that he lived alone, was able to attend to his personal hygiene and some household chores in 15-20 minute increments due to his fatigue, and took public transportation to attend therapy sessions. Otherwise, Mr. Washington stated that he would lie on the couch all day watching television or sleeping. The ALJ did not explain how that evidence conflicted with Dr. Masters's opinion, which focused on Mr. Washington's abilities to understand, remember, and follow instructions, to maintain his attention and concentration for extended periods, to work with coworkers and supervisors, and to interact appropriately with others. AR 752–53. Accordingly, to the extent the ALJ rejected Dr. Masters's opinion based on evidence of Mr. Washington's "high activities of daily living throughout the record," the Court finds that such a conclusion is not based on substantial evidence.

### c. Dr. Masters's treatment notes

"A conflict between treatment notes and a treating provider's opinions may constitute an adequate reason to discredit the opinions of a treating physician or another treating provider."

*Ghanim*, 763 F.3d at 1162. Here, the ALJ noted specific conflicts between Dr. Masters's opinion and her own treatment notes as well as those of other medical providers. The treatment notes consistently indicate that Mr. Washington's depression appeared mild in nature. *See, e.g.*, AR 640, 719, 853, 855. Those notes contradict Dr. Masters's opinion that Mr. Washington was moderately limited in his activities of daily living, his social functioning, and his concentration, persistence, and pace. AR 753. The Court finds that this conflict was a clear and convincing reason to discount Dr. Masters's opinion based on substantial evidence.

### d.     Summary

As noted above, the ALJ did not consider all of the factors he was required to consider under 20 C.F.R. § 416.927(c)(2)-(6) and 20 C.F.R. § 404.1527(c)(2)-(6) in discounting the opinion of Mr. Washington's treating physician. Ordinarily, that failure would constitute reversible error. *Trevizo*, 871 F.3d at 676. However, the ALJ's conclusion that Dr. Masters's opinion conflicted with her own treatment notes constitutes an independent, clear and convincing reason for discounting her opinion. *See Carmickle v. Comm'er, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) (finding a single erroneous basis for an ALJ's determination is harmless error if valid reasons supporting that determination remain); *Warn v. Colvin*, No. 2013 WL 943411, at *13 n.10 (E.D. Cal. Mar. 11, 2013) (finding that despite two improper reasons for discounting examining psychiatrist's opinion, the ALJ gave other valid reasons for attributing less weight to the opinion, so the errors were harmless); *see also Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) ("Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) ("'Substantial evidence' means 'more than a scintilla,' but 'less than a preponderance.'") (internal citations omitted).

For these reasons, the Court concludes that the ALJ did not err in discounting Dr. Masters's opinion regarding the extent of Mr. Washington's mental impairments.

### 2.     Dr. Ikawa's opinion

The ALJ also gave little weight to Dr. Ikawa's assessment that Mr. Washington is moderately limited in his ability to understand and remember detailed instructions and his ability

to carry out detailed instructions. As Dr. Ikawa did not treat or examine Mr. Washington, his opinion would ordinarily be entitled to less weight than the opinion of a treating physician, such as Dr. Masters. *Lester*, 81 F.3d at 830 ("As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."). Here, the ALJ did not cite Dr. Ikawa's status as a non-treating, non-examining physician as the basis for discounting Dr. Ikawa's opinion. AR 34. Instead, the ALJ gave two other reasons: it was inconsistent with the medical record disclosing "inconsistent and sporadic psychiatric treatment without even consistent psychotropic medication treatment, without significant mental status findings," and it was inconsistent with Mr. Washington's history of "high activities of daily living." *Id.* The ALJ did not explain or support either of these reasons, and he provided no other reasons for discounting Dr. Ikawa's assessment.

The Court has already considered whether the ALJ's findings that Mr. Washington's psychiatric treatment, medication, mental health status findings, and activities of daily living are inconsistent with an opinion that Mr. Washington has "moderate" limitations in his ability to understand, remember, and carry out detailed instructions. *See supra* Section IV.A.1.a-b. For the same reasons discussed above with respect to Dr. Masters's opinion, the Court concludes that substantial evidence does not support the ALJ's decision to discount Dr. Ikawa's opinion on these grounds. Dr. Ikawa's opinion may indeed be entitled to little weight, particularly given other evidence in the record. *See Gallant v. Heckler*, 753 F.2d 1450, 1454 (9th Cir. 1984) ("A report of a non-examining, non-treating physician should be discounted and is not substantial evidence when contradicted by all other evidence in the record.") (internal quotation marks omitted); *Sultan v. Barnhart*, 368 F.3d 857, 863 (8th Cir. 2004) (finding no error in ALJ's rejection of non-examining consultant's opinion because it contradicted evidence provided by treating physicians and opinions of other non-examining experts). However, the Court cannot determine whether the ALJ correctly assigned Dr. Ikawa's opinion such weight, as the decision relies on a conclusory explanation that cites two reasons, neither of which is supported by substantial evidence. *See Jarvis v. Berryhill*, 722 F. A'ppx 616, 619 (9th Cir. 2018) (finding that ALJ erred by rejecting non-examining physician's opinion "in a conclusory manner"). Moreover, it is not clear whether

34

the ALJ would have concluded that Mr. Washington was not disabled and that he was capable of performing his past work as an accounts payable clerk had the ALJ not discounted Dr. Ikawa's opinion.

For these reasons, the Court concludes that the ALJ erred in discounting Dr. Ikawa's opinion regarding the extent of Mr. Washington's mental impairments.

### B. The ALJ's Step 4 Analysis of Mr. Washington's Physical Impairment

In finding that Mr. Washington is not disabled based on his severe pulmonary embolism, the ALJ concluded that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" based primarily on what the ALJ perceived to be inconsistencies in Mr. Washington's testimony as compared to his medical records. AR 35–38. Mr. Washington argues that the ALJ erred in determining that his testimony was less than fully credible. Dkt. No. 25 at 9–12. Mr. Washington also contends that the ALJ erred in discounting Dr. Masters's medical source statement. *Id.* at 7. The Commissioner maintains that the ALJ properly assessed Mr. Washington's credibility and assigned the appropriate weight to Dr. Masters's opinion. Dkt. No. 30 at 10–12.

### 1. The ALJ's credibility findings

In evaluating the credibility of a claimant's testimony regarding subjective symptoms, an ALJ must engage in a two-step analysis. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* at 1036 (internal citations and quotation marks omitted). The claimant is not required to show that his impairment "could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused some degree of the symptom." *Id.* (internal quotation omitted). "[O]nce the claimant produces objective medical evidence of an underlying impairment, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity . . . ." *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (internal citation omitted). At the second step, unless there is affirmative evidence showing that

the claimant is malingering, "the ALJ can reject the claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 1282. "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834.

Because the ALJ did not find that Mr. Washington was malingering, he was required to provide clear and convincing reasons to justify his rejection of Mr. Washington's testimony about his symptoms. The Court concludes that the ALJ satisfied his burden.

### a. Objective medical evidence of underlying impairment

The ALJ concluded that Mr. Washington's history of pulmonary embolism could reasonably be expected to cause the symptoms he alleges, including an inability to perform chores or walk for more than 10 or 15 minutes at a time, fatigue and weakness, shortness of breath, headaches, and an inability to sit for long periods of time. AR 35. Neither party challenges this conclusion.

### b. The ALJ's analysis regarding the severity of symptoms

The ALJ determined that Mr. Washington's statements regarding the intensity, persistence, and limiting effects of the symptoms are inconsistent with the medical evidence and other evidence in the record. In particular, the ALJ concluded that the conservative treatment Mr. Washington received, his improvement following medication and treatment, and his testimony regarding his activities of daily living did not support his alleged severity of symptoms.

### i. Objective medical evidence

The ALJ did not make any express findings concerning objective medical evidence; however, the ALJ noted that testing indicated that Mr. Washington had likely suffered a pulmonary embolism, his INR levels remained within the target range following warfarin treatment, he repeatedly showed no desaturated oxygen levels with ambulation at the doctor's office, a pulmonary function test showed no significant findings, and his EKG was normal. AR 35–37. Mr. Washington argues that the ALJ only cited the objective medical evidence generally and did not identify any particular findings that were inconsistent with any of the specific functional deficits. Dkt. No. 25 at 10. The Court disagrees. The ALJ cited to specific objective

medical evidence that appears to be inconsistent with Mr. Washington's claims of persistent

shortness of breath that interferes with his ability to work. AR 36–37 (discussing chest x-ray and

lung scan VQ which were negative for any significant findings on September 16, 2014,

insignificant laboratory results for fatigue and dyspnea on exertion on April 21, 2015, normal

saturation levels with ambulation on April 21, 2015, and pulmonary function test without

significant findings on November 23, 2015).

However, the ALJ was not permitted to rely solely on objective medical evidence in

rejecting Mr. Washington's statements about his symptoms. 20 C.F.R. §§ 416.929(c)(2),

404.1529(c)(2) (2016) ("[W]e will not reject your statements about the intensity and persistence of

your pain or other symptoms or about the effect your symptoms have on your ability to work . . .

solely because the available objective medical evidence does not substantiate your statements.").

The ALJ was required to look to other evidence, including Mr. Washington's own statements,

medical sources, and any other sources that might have information about his symptoms, before

discounting Mr. Washington's testimony about the severity of his symptoms.

### ii.      Activities of daily living

A claimant's daily activities may support an adverse credibility finding if a claimant is able

to spend a substantial part of his day engaged in pursuits involving the performance of physical

functions or skills that are transferable to a work setting. *Orn*, 495 F.3d at 639.

Mr. Washington argues that the ALJ failed to specify what part of his testimony was not

credible and that the ALJ did not provide clear and convincing reasons supported by evidence in

the record to support that finding of a lack of credibility. Dkt. No. 25 at 11. Again, the Court

disagrees. The ALJ specifically called out the portions of Mr. Washington's testimony that he

found less than credible: that Mr. Washington can no longer work, he cannot perform household

chores for more than 10 or 15 minutes, he is tired and weak, he has shortness of breath, he is

unable to sit or walk for long periods of time, he has headaches two to three times a week, he

experiences "loopiness" side effects from his psychiatric medication, and he has difficulty lifting a

gallon of milk. AR 35. In particular, the ALJ found those allegations inconsistent with Mr.

Washington's other testimony and statements that he is able to attend to his own personal

grooming and hygiene, prepare his own meals, perform all his household chores without limitation other than performing them in 10- or 15-minute increments, go out alone, shop in stores and online, take public transportation to attend daily group therapy sessions, and perform volunteer work. *Id.*

The Ninth Circuit has recognized that "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations" and thus held that "[o]nly if [the claimant's] level of activity were inconsistent with [his] claimed limitations would these activities have any bearing on [the claimant's] credibility." *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014) (quoting *Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir. 1998)) (internal quotation marks omitted). Here, the ALJ does not explain how Mr. Washington's activities of daily living, as he described them in his hearing testimony and function reports, are inconsistent with his asserted impairments. He is able to care for himself and take care of household chores but only so long as he performs them in 10-15 minute increments. AR 59. He can navigate shopping and public transportation to his group sessions alone, but he must take breaks to rest when moving around. AR 56 ("Q. Okay. And so you said that after about 15, 20 minutes of standing or walking, you need to sit down? A. Correct, yes. . . . I have to sit down, or if I'm walking down the street and there's nowhere to sit, I have to stop and bend over to catch my breath. Otherwise I get lightheaded and feel like I'm passing out. . . . [I]t usually lasts about give minutes or so, and then once I like bend over and breathe . . . and catch my breath, it's like okay, I can go on another little bit."). After he returns from his daily group session, he must rest again for a while. AR 58.

The Commissioner concedes that these activities of daily living "are not equivalent to full-time work" but argues that they show Mr. Washington is more capable than he alleged. Dkt. No. 30 at 11. Nevertheless, even if Mr. Washington is more capable than he alleged, that does not necessarily compel the conclusion that he was not disabled. The ALJ did not explain how Mr. Washington's activities of daily living translate to a work setting and how they inform the ALJ's conclusion that Mr. Washington is not disabled. *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989) ("[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take

medication."); *Garrison*, 759 F.3d at 1016 ("'The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.'") (quoting *Bjornson v. Astrue,* 671 F.3d 640, 647 (7th Cir. 2012)). Thus, to the extent the ALJ relied on Mr. Washington's activities of daily living as a reason to discount his credibility as to the intensity, persistence, and limiting effects of his condition, that reliance was not supported by clear and convincing reasons.

### iii.    Medical record evidence

Mr. Washington's testimony was not the sole basis for the ALJ's unfavorable disability determination. The ALJ looked beyond the objective medical evidence to Mr. Washington's medical records, which the ALJ found did not support Mr. Washington's claims of disability. The ALJ determined that the records described "conservative" treatment inconsistent with "the type of medical treatment one would expect for a totally disabled individual." AR 35. The ALJ spent two pages summarizing the two-year history of Mr. Washington's pulmonary embolism, his subsequent dyspnea, headaches, and fatigue complaints, and the testing and conservative treatment he received in connection with addressing those symptoms. AR 35–37. The ALJ concluded that the pulmonary embolism had been resolved after six months of warfarin treatment and that Mr. Washington remained stable thereafter. Additionally, the ALJ noted that laboratory results did not support the fatigue complaint, which Dr. Masters suspected was the result of mild anemia. Finally, the ALJ observed that Mr. Washington's headaches, which occurred daily at the worst, were mild and treated with Tylenol. AR 37; *see also* AR 481, 483, 491, 494. The thoroughness of the ALJ's analysis of the medical records supports his determination that Mr. Washington's symptoms are not as debilitating as he claims. The record also reflects that the ALJ accounted for Mr. Washington's limitations by acknowledging that Mr. Washington could only perform tasks requiring light exertion. AR 37.

The Court therefore finds that the ALJ provided clear and convincing reasons for his

disability determination based on Mr. Washington's medical records and the objective medical evidence. Any error committed in assessing Mr. Washington's credibility based on his hearing testimony was harmless because other evidence in the record supported the ALJ's determination. The Court denies Mr. Washington's summary judgment motion and grants the Commissioner's summary judgment motion on this point.

### 2. Dr. Masters's opinion

The ALJ gave little weight to Dr. Masters's medical source statement concerning Mr. Washington's physical impairments because he found her opinions to be inconsistent with her own medical notes clearing Mr. Washington to return to work as early as February 2014, and because she treated Mr. Washington with warfarin for only six months. AR 37. The ALJ also found Dr. Masters's medical source statement inconsistent with Mr. Washington's infrequent and conservative treatment for his symptoms since his initial hospitalization, the lack of any objective medical findings other than mild anemia, and Mr. Washington's "high activities of daily living throughout the record." *Id.*

As discussed above with respect to Dr. Masters's mental medical source statement, it is unclear whether the ALJ considered all the factors he was required to consider under 20 C.F.R. § 416.927(c)(2)-(6) and 20 C.F.R. § 404.1527(c)(2)-(6). *See supra* Section IV.A.1. Although the ALJ noted that Dr. Masters was Mr. Washington's primary care physician who saw Mr. Washington on an annual basis, he did not address her specialization, noting only that she was his primary care physician. AR 37. For the same reasons the ALJ erred in rejecting Dr. Masters's mental medical source statement, he also erred with respect to Dr. Masters's opinion concerning Mr. Washington's pulmonary embolism. *See supra* Section IV.A.1.

However, the Court finds that this error was harmless because the ALJ provided other clear and convincing reasons for discounting Dr. Masters's opinion. *See id.* at 675. The ALJ considered and discussed at length Mr. Washington's pulmonary embolism treatment history. AR 35–37. The ALJ noted that testing indicated that Mr. Washington's INR levels remained within the target range following warfarin treatment, he repeatedly showed no desaturated oxygen levels with ambulation at the doctor's office, a pulmonary function test showed no significant findings,

and his EKG was normal.  AR 35–37 (discussing chest x-ray and lung VQ scan which were negative for any significant findings on September 16, 2014, insignificant laboratory results for fatigue and dyspnea on exertion on April 21, 2015, normal saturation levels with ambulation on April 21, 2015, and pulmonary function test without significant findings on November 23, 2015). Indeed, Dr. Masters herself noted in February 2014: "[patient] advised that he can return to work when he feels he is physically able to perform his tasks."  AR 720.  Because this objective medical evidence and the medical records did not support Dr. Masters's opinion regarding the severity of Mr. Washington's limitations, the ALJ was justified in discounting her opinion.  *Bray*, 554 F.3d at 1228 ("The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.") (internal quotation marks omitted).

Accordingly, the Court finds that the ALJ properly discounted Dr. Masters's opinion as to Mr. Washington's pulmonary embolism impairment, and therefore denies Mr. Washington's summary judgment motion and grants the Commissioner's motion for summary judgment as to that issue.

## V.     DISPOSITION

For the reasons discussed above, the Court finds that the ALJ provided clear and convincing reasons based on substantial evidence to discount Dr. Masters's opinions concerning Mr. Washington's depression and pulmonary embolism conditions, and therefore grants the Commissioner's summary judgment motion as to Dr. Masters's opinions.  However, because the ALJ did not provide clear and convincing reasons based on substantial evidence for discounting Dr. Ikawa's opinion as to Mr. Washington's depression, the Court grants Mr. Washington's summary judgment motion as Dr. Ikawa's opinion.

"When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits."  *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citing *Treichler v. Comm'r of Soc. Sec. Admin*., 775 F.3d 1090, 1099 (9th Cir. 2014)).  That is because "an ALJ's failure to provide sufficiently specific reasons for rejecting the testimony of a claimant or other witness does not, without more, require

the reviewing court to credit the testimony as true." *Treichler*, 775 F.3d at 1106.

The Court may order an immediate award of benefits only if three conditions are met. First, the Court asks "whether the 'ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'" *Leon*, 880 F.3d at 1045 (quoting *Garrison*, 759 F.3d at 1020). Next, the Court "determine[s] 'whether there are outstanding issues that must be resolved before a determination of disability can be made . . . and whether further administrative proceedings would be useful.'" *Id*. (quoting *Treichler*, 775 F.3d at 1101). "When these first two conditions are satisfied, [the Court] then credit[s] the discredited testimony as true for the purpose of determining whether, on the record taken as a whole, there is no doubt as to disability." *Id*. Even when all three conditions are satisfied and the evidence in question is credited as true, it is within the district court's discretion whether to make a direct award of benefits or to remand for further proceedings when the record as a whole creates serious doubt as to disability. *Id*. As explained by the Ninth Circuit, "[a]n automatic award of benefits in a disability benefits case is a rare and prophylactic exception to the well-established ordinary remand rule." *Id*. at 1044.

In the present case, the first condition is met with respect to Mr. Washington's mental impairments because the Court has found that the ALJ failed to provide legally sufficient reasons for giving only little weight to Dr. Ikawa's opinion. However, there are outstanding issues that must be resolved before a final determination can be made. If the ALJ were to accept Dr. Ikawa's opinion that Mr. Washington is moderately impaired in his ability to maintain concentration, persistence, or pace, then the ALJ might conclude that Mr. Washington is unable to perform his past relevant work, in light of the vocational expert's testimony that a person with such moderate difficulties would be unable to perform Mr. Washington's past relevant work. Therefore, on remand, the ALJ must reassess Dr. Ikawa's opinion with respect to Mr. Washington's mental impairments, in view of the record as a whole, and provide legally adequate reasons for any portion of that opinion or statement that the ALJ discounts or rejects.

## VI.    CONCLUSION

Based on the foregoing, Mr. Washington's motion for summary judgment is granted in part

and denied in part, the Commissioner's cross-motion for summary judgment is granted in part and denied in part, and this matter is remanded for further proceedings consistent with this order. The Clerk of the Court shall enter judgment accordingly and close this file.

**IT IS SO ORDERED.**

Dated: September 5, 2019

VIRGINIA K. DEMARCHI
United States Magistrate Judge